**CITIES OF NEWARK, NEW CASTLE AND SEAFORD, DELAWARE, and Town of Smyrna, Delaware, Petitioners,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION and Delmarva Power & Light Company, Intervenors.**

No. 84–3049.

United States Court of Appeals, Third Circuit.

Argued Sept. 11, 1984.

Decided June 3, 1985.

Rehearing Denied July 29, 1985.

Wallace L. Duncan, J. Cathy Lichtenberg (Argued), Duncan, Weinberg and Miller, Washington, D.C., for petitioners.

William H. Satterfield, Gen. Counsel, Barbara J. Weller, Deputy Sol., Michael E. Small (Argued), Joel M. Cockrell, F.E.R.C., Washington, D.C., for respondent F.E.R.C.

Robert J. Glasser (Argued), LeBoeuf, Lamb, Leiby & MacRae, New York City, for intervenor Delmarva; Dale G. Stoddley, Gen. Counsel, Delmarva Power and Light Co., Wilmington, Del., of counsel.

Before SEITZ, BECKER and ROSENN, Circuit Judges.

## OPINION OF THE COURT

BECKER, Circuit Judge.

This opinion addresses a petition for review of an order of the Federal Energy Regulatory Commission ("FERC" or the "Commission") by four Delaware municipalities ("municipalities") that purchase electric power at wholesale from intervenor Delmarva Power and Light Company ("Delmarva"). The petition raises two important questions, one concerning our jurisdiction and the other concerning the substance of the Commission's order.

The threshold question is whether we have subject matter jurisdiction under § 313(b) of the Federal Power Act (the "Act"), 16 U.S.C. § 825*l* (b) (1974), to review the Commission's order. Under this provision, parties aggrieved by an order of the Commission must file a petition for review "within sixty days after the order of the Commission upon the application for rehearing" of the order. *Id.* In this case, the municipalities filed a petition for review more than 60 days after the Commission's order upon rehearing of the substantive issue raised here but within 60 days of a later Commission order disposing of a motion for further rehearing. That rehearing motion and the subsequent order address two issues discussed in the original rehearing order, but not raised in this court. We hold that the sixty-day period under § 313(b) was tolled by the municipalities' motion for rehearing of an issue addressed in an earlier order on rehearing, and that their timely petition for review following the second order on rehearing permits the municipalities to raise all issues that might have been raised in a petition for review of the first order on rehearing. Accordingly, we conclude that we have jurisdiction to consider the Petition for Review.

The question on the merits is whether the Commission acted arbitrarily and capriciously or abused its discretion in concluding that the disparity between the rates charged by Delmarva to its wholesale cooperative customers and the rates changed to its municipal customers did not violate the antidiscrimination mandate of § 205(b) of the Federal Power Act, 16 U.S.C. § 824d(b) (1974). The disparity arose solely as a result of a partial settlement entered into by Delmarva and its wholesale cooperative customers. The settlement, according to the municipalities, incorporated a demand allocation methodology which had been proposed by Delmarva but was later rejected by the Commission on the ground that the methodology allocated too large a portion of Delmarva's demand-related costs to the utility's municipal customers.

Despite its rejection of Delmarva's proposed methodology, the Commission nevertheless decided to tolerate the resulting disparity in rates, ruling that the rate discrimination in this case does not constitute an "undue preference or advantage" or "unreasonable differences in rates" within

the meaning of § 205(b). In support of its decision, the Commission noted four principal considerations: (1) the disparity was temporary; (2) the disparity was not due to bad faith or improper conduct on the part of the utility; (3) Delmarva did not advantage itself by settling with the cooperatives; and (4) there was no evidence of actual competitive harm to the municipalities. We conclude that these findings of fact by the Commission are supported by substantial evidence, and that the Commission considered the appropriate factors in determining that the rate differential did not violate the antidiscrimination mandate of § 205(b). We will therefore deny the petition for review.

## I. FACTS AND PROCEDURAL HISTORY

### A. Delmarva's Filing and Interim Proceedings

Delmarva supplies electric power at wholesale to customers in Delaware, Maryland, and Virginia, including eight municipalities in the state of Delaware, four of which are petitioners in this case.[1] On May 31, 1978, Delmarva submitted to FERC proposed wholesale rate increases designed to generate a revenue increase of $7,819.530 over Delmarva's prior rates for the 12-month period ending December 31, 1978. Upon receipt of objections by a number of

Delmarva's customers, FERC suspended the proposed rates for the maximum period of five months, set the case for hearing, and granted intervention to a number of Delmarva's wholesale customers, including six Delaware municipally-owned utilities and the three rural electric cooperatives, see supra note 1, and others.[2]

Wholesale rate filings before FERC must include some method by which the utility proposes to allocate its total cost of providing service among the utility's various classes of customers. One major category of costs is that of so-called "demand costs." As a general matter, demand costs encompass a utility's fixed or capacity-related costs, including the cost of providing generating and transmission facilities. Apportioning these costs among customers presents "theoretical and practical problems," Cities of Batavia, et al. v. F.E.R.C., 672 F.2d 64, 80 (D.C.Cir.1982), for the customers typically use the system capacity on a joint basis.[3]

Delmarva's 1978 rate filing proposed to allocate demand costs among its wholesale customer classes on the basis of a four-day coincident peak ("4–DCP") cost allocation method. This method allocates demand costs to customers based on each customer's average contribution to demand for electricity during Delmarva's four highest power sales days.[4] In support of its choice

**1.** Delmarva serves one private company in Delaware; eight Delaware municipalities: Newark, New Castle, Middleton, Smyrna, Clayton, Milford, Lewes, and Seaford; three Maryland municipalities; and three rural wholesale electric cooperatives: the Delaware Electric Cooperative, the Choptank Electric Cooperative in Maryland, and the Accomack-Northampton Electric Cooperative in Virginia.

**2.** The intervening Delaware municipalities were Newark, Milford, Seaford, Smyrna, New Castle, and Lewes. Intervention was also granted to United States Senator Joseph R. Biden, Jr., of Delaware; to the Public Service Commission of Maryland; and to the Maryland Peoples Counsel.

**3.** There are many methods in common use in the industry for this purpose. One text referred to in Cities of Batavia notes the existence of some 29 formulas for this purpose, with three general approaches being in broadest use. J.

Bonbright, Power Act Principles of Public Utility Rates, 351 (1968) (cited in Cities of Batavia, 672 F.2d at 80). The 4–DCP method, which was the basis of Delmarva's original filing, and the 12–CP method used ultimately by FERC in this case, are two variants on the "peak responsibility method." J. Bonbright, supra, at 352.

**4.** Although the sentence in the text describes the essence of the methodology, its actual derivation is somewhat more complicated. The ALJ elaborated in his opinion:

The Company took the average of the four highest daily CPs in 1977 (actual figures), divided by the average of the two highest monthly CPs in 1977 (actual figures), which occurred in July and August, and applied that ratio to the average of the estimated monthly CPs for July and August in 1978 in order to solve for the average of the four highest daily CPs in 1978 [citing Transcript at 1036, reprinted in Joint Appendix at 224].

of the 4–DCP method, Delmarva argued essentially that its system peak consistently occurred during the summer, and that its annual system peak load was the most important factor affecting its decision regarding additions to its power supply capacity. *See Delmarva Power & Light Company,* 17 F.E.R.C. ¶ 63,044, at 46 (December 2, 1981) (initial decision of Administrative Law Judge).[5] The revenue increase sought by Delmarva on the basis of the 4–DCP allocation methodology amounted to $4,002,947 from its wholesale municipal customers and $3,888,636 from its wholesale cooperative customers.

Several of Delmarva's customers, including the petitioners here, raised objections to Delmarva's filing. Of relevance to this case, the petitioners argued before the Commission that Delmarva's use of the 4–DCP method was unsupportable and unreasonable. They noted that Delmarva had submitted no studies or support for its use of 4–DCP peaks or for the method by which it projected those peaks. The petitioners asserted that Commission precedent as applied to Delmarva's system and demand characteristics dictated that demand costs be allocated under the 12–CP method. Under this method, "demand costs are based upon the average of each month's peak demand during the year; the allocation among customer classes is based upon their average contribution to the average monthly peak." *Cities of Batavia,* 672 F.2d at 81. The municipalities assert that, based upon the 12–CP methodology, Delmarva would have sought a revenue increase of $3,873,953 from its wholesale mu-

nicipal customers and $5,768,869 from its wholesale cooperative customers. Thus, compared with the 4–DCP method, the 12–CP method results in a substantially greater proportion of total demand costs being allocated to Delmarva's cooperative customers.

In September 1978, prior to the commencement of proceedings before the Commission, Delmarva and its wholesale cooperative customers entered into a settlement, which the parties filed with the Commission for its approval. The settlement provided for a 36 percent reduction in Delmarva's filed rates to the cooperatives.[6] Delmarva made the same offer to the municipalities, but they rejected it. Delmarva and its cooperative customers stipulated that the agreement "represents a compromise for the purpose of settlement and is not to be regarded as a precedent with respect to any ratemaking principle." Joint Appendix at 370 (motion for approval of settlement agreement). The Commission, however, appears to have assumed that the settlement was based on the 4–DCP method, *see* 24 F.E.R.C. ¶ 61,199 at 61,645 (1983) (Opinion No. 185) (*reprinted in* Joint Appendix at 85) ("[t]he discrimination [found by the ALJ to violate § 205(b)] arose at the settlement stage solely from Delmarva's use of a 4-day CP demand cost allocation method"), and the municipalities take the same position before this Court.

The municipalities subsequently withdrew their objections to the settlement on the understanding that it had no precedential effect on the question of what con-

---

Delmarva Power & Light Co., 17 F.E.R.C. § 63.044, at 48 (December 2, 1981) (initial decision of Administrative Law Judge).

**5.** Delmarva also argued that it is obligated to have generating capacity to meet this load requirement under its power pool agreement with other utilities in Pennsylvania, New Jersey, and Maryland, and that it will remain a summer peaking utility with a widening gap between summer and winter peaks. Delmarva took the position that its summer peaking characteristic made the peak allocation ("1–CP") method theoretically most appropriate. The utility chose the 4–DCP method, however, because that method in its view places proper emphasis on the sum-

mer peak while avoiding the drastic shift in demand costs that could be occasioned by use of the 1–CP method. *See* Delmarva Power & Light Co., 17 F.E.R.C. ¶ 63,044, at 46 (1981).

**6.** The settlement initially contained a "Most Favored Nations Clause," which provided that, in the event that Delmarva reached a settlement with its municipal wholesale customers which resulted in a greater percentage decrease than that agreed to between Delmarva and the cooperatives, the cooperatives would receive the same percentage reduction. However, this clause was deleted following the municipalities' objection.

stituted the fair and reasonable rate which the Commission was obliged to fix under § 205(a) of the Federal Power Act, 16 U.S.C. § 824d(a) (1974), and that the municipalities did not thereby forfeit their right to contest at a later date the issues of demand cost allocation methodology and any resulting discrimination. The staff of the Commission supported the agreement, and the Commission approved it, as amended, *see supra* note 6, on Feb. 19, 1981. Joint Appendix at 48. In due course the matter of Delmarva's filing with respect to its non-settling customers came on before an Administrative Law Judge ("ALJ").

### B. *The ALJ's Decision*

The administrative hearing went forward on numerous issues, including the appropriate demand allocation method and the municipalities' discrimination claim.[7] The ALJ then issued an initial decision, 17 F.E.R.C. ¶ 63,044 (1981). In ruling on the allocation issue, the ALJ first stated that the "Commission has not adopted any one method of demand cost allocation to the exclusion of others." *Id.* at 47. He then rejected Delmarva's proposed 4-DCP method, noting that the Commission had never approved this "unique" method and concluding that Delmarva had failed to justify its reason-

ableness.[8] *Id.* at 56. After an extensive analysis of Delmarva's system load characteristics, in which he applied a number of tests set forth in Commission opinions, the ALJ concluded that a 12-CP method of demand allocation would be more appropriate.[9]

Turning to the discrimination issue, the ALJ concluded that the disparity in rates between the cooperative customers and the municipalities violated the anti-discrimination mandate of § 205(b) of the Federal Power Act. He also concluded that the disparity in rates resulted from Delmarva's use of an unacceptable (4-DCP) method of demand allocation in its settlement agreement with the cooperatives, inasmuch as the 4-DCP method improperly allocated demand costs in favor of the cooperatives. The ALJ specifically rejected the argument that the resulting rate difference was rendered lawful by virtue of the facts that the cooperatives had accepted the settlement offer and the municipalities had not. The ALJ concluded that the municipalities were justified in rejecting a settlement offer based upon an allocation method later found to be unreasonable, and further noted that the municipalities' decision to litigate the allocation issue had resulted in vindication of their position. To remedy

---

**7.** The ALJ also addressed nine other discrete allocation issues, seven discrete rate design and tariff issues, and a number of miscellaneous issues. Delmarva's wholesale customers other than the cooperatives and the Commission staff participated, as did the Maryland and Delaware Public Service Commissions.

**8.** The ALJ particularly expressed reservations about the question of stability of the 4-DCP method, because Delmarva's expert witness admitted that the accuracy of the 4-DCP method depends on the constancy of the ratio of the average of the four highest daily CPs to the average of the two highest monthly CPs from year to year. *See supra,* note 4.

**9.** The ALJ's analysis was quite detailed. *Inter alia,* he focused on peak load patterns, scheduled maintenance (the ALJ found that Delmarva had an annual maintenance program utilizing the ten off-peak months to insure adequate capacity), reserves after adjustment for scheduled maintenance and forced outages (the ALJ found that the variance between the reserves in July

and August and the other ten months were not significant), and Delmarva's unlimited right to interrupt service to large industrial customers during peak periods, enabling the utility to control its capacity costs. He cited a number of cases in which the Commission had also considered the ratio of the lowest monthly peak to the annual peak in determining the proper method of demand cost allocation and found that Delmarva's profile matched those in other cases in which the Commission had adopted a 12-CP method. Similar results were found to flow from other tests. Finally, the ALJ relied on the reserve figures which showed that Delmarva did not underutilize its system from September to June, an analysis that indicated to him that the 4-DCP method, which allocates cost based only on demands in July and August, is less appropriate than the 12-CP method. In sum, while the ALJ found that the Delmarva system showed a peak in July and August, he found that it was not so pronounced to support use of a demand allocation method, such as the 4-DCP method, based only on demands in those two months.

the discrimination, the ALJ reduced the rates to be charged the non-settling municipalities to the lower end of the "zone of reasonableness" within the meaning of § 205(a) of the Act. *See FPC v. Conway Corp.*, 426 U.S. 271, 278, 96 S.Ct. 1999, 2004, 48 L.Ed.2d 626 (1976).

### C. *The Commission's Decision*

The Commission affirmed the ALJ's adoption of a 12–CP method of allocation. 24 F.E.R.C. ¶ 61,199, at 61,462 (1983) (Opinion No. 185) (*reprinted in* Joint Appendix 63, 87). However, it reversed the ALJ on the undue discrimination issue, holding that where a temporary difference in rates as between classes of customers has a logical explanation and where that difference is not due to bad faith or improper conduct on the part of the utility, then the difference should not be held unlawful in the absence of evidence, information, or facts which would either demonstrate or permit the Commission to find that the disparity in rates is likely to result in actual competitive harm or would otherwise be unduly discriminatory. *Id.* at 61,465, *reprinted in* Joint Appendix at 86. The Commission stated that this test had been applied in factually similar circumstances in *Central Illinois Public Service Co.*, 20 F.E.R.C. ¶ 61,043 (1982) (Opinion No. 142), *affirmed sub nom. Cities of Bethany v. FERC*, 727 F.2d 1131 (D.C.Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 293, 83 L.Ed.2d 229 (1984).

Conceding that a utility may not "use a fixed-rate contract as a device to render unassailable an otherwise prohibited undue preference," *see Town of Norwood v. FERC*, 587 F.2d 1306 (D.C.Cir.1978), the Commission nevertheless found no undue discrimination under the circumstances. In support of this conclusion, the Commission stated that: (1) the ALJ found no evidence of collusive behavior in connection with the settlement; (2) Delmarva offered the mu-

nicipalities a settlement based on the same ratemaking principles as the cooperatives' settlement; (3) Delmarva did not advantage itself by settling with the cooperatives; (4) Delmarva's action did not cause the municipalities to pay in excess of the lawful rate; (5) the municipalities had presented no evidence of actual competitive harm resulting from the disparity; and (6) the disparity would last only for a "locked-in" period of two years, since Delmarva had announced to its customers that its 1982 rate case and future rate cases would be based upon the 12–CP demand allocation method.[10]

### D. *The Post-Decision Proceedings and the Filing of the Petition for Review*

As we have noted, the Commission first addressed the discrimination issue in Opinion No. 185, issued August 1, 1983. In accordance with § 313(b) of the Act, the municipalities sought rehearing of that determination, and the Commission denied rehearing in Opinion No. 185–A, issued September 29, 1983. 24 F.E.R.C. ¶ 61,379 (1983). Opinion 185–A discussed in detail six issues, not including the discrimination issue. As to that issue and the others addressed in Opinion No. 185, the Commission summarily reaffirmed its earlier order. Pursuant to FERC procedures, the municipalities then sought rehearing of two issues that are discussed in Opinion No. 185–A but are not directly related to the discrimination issue raised in the Petition for Review: (1) how Delmarva's cash-working capital allowance should be computed; and (2) whether interruptible retail industrial loads should be considered in allocating demand costs. That petition was denied by the Commission on November 28, 1983. 25 F.E.R.C. ¶ 61,308 (1983). The municipalities filed their petition for review with this court on January 26, 1984, less than 60

---

10. Delmarva filed two rate cases (FERC Docket No. ER80–363–000, filed April 30, 1980, and Docket No. ER81–504–000, filed May 30, 1981) subsequent to its May 31, 1978, filing and prior to the Initial Decision finding the 4–DCP meth-

od to be unreasonable. *See* 24 F.E.R.C. ¶ 61,199, at 61,466 and n. 71. All issues have been settled in the 1981 filing. No aspects of the 1980 filing are before us.

days thereafter, but 119 days after the Commission's Order on Rehearing in Opinion No. 185–A.

## II. *JURISDICTION*

■■■ Section 313(b) of the Federal Power Act, 16 U.S.C. § 825*l* (b), (1974), requires that parties aggrieved by an order of the Commission must petition for review "within sixty days after the order of the Commission upon the application for rehearing." *Id.* The rehearing of issues before the Commission is an integral part of the statute: "No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do." *Id.* Section 313(a) of the Act, 16 U.S.C. § 825*l* (a) (1974), provides that "[a]ny person, State municipality or State commission aggrieved by an order issued by the Commission may apply for a rehearing of an order within thirty days of its issuance,[11] and thus appears to permit petitions for rehearing of orders on rehearing. The statute is silent, however, as to the effect of such a petition on the timeliness requirement in § 313(b).

FERC and Delmarva contend that the relevant order in this case was Opinion No. 185–A, issued on September 29, 1983, in which the Commission denied rehearing on the municipalities' claim of discrimination. FERC and Delmarva argue that since the municipalities elected not to pursue further this particular matter before the Commission, the 60-day period under § 313(b) commenced on September 29, 1983, and expired on November 28, 1983, well before the municipalities' petition for review was filed. The application for rehearing subsequent to Opinion No. 185–A did not raise the subject of discrimination as between the cooperative and municipal customers, and the Order of November 28, 1983, did not address it. Delmarva and the Commission

submit that we should not permit the municipalities to "boot-strap" their untimely petition into a timely one on the basis of the Commission order of November 28, 1983.

The courts have consistently held that the 60-day statutory time period of § 313(b) creates a jurisdictional bar to judicial review. *See, e.g., Cities of Batavia v. FERC,* 672 F.2d 64, 72–73 (D.C.Cir.1982); *Distrigas Corp. v. FERC,* 608 F.2d 25, 27 (1st Cir.1979). However, not all orders of the Commission, or of other administrative agencies, are immediately reviewable. Although § 313(b) is not limited by its terms to "final orders," courts have long placed the judicial gloss of the finality requirement on their interpretations of the provision. *See, e.g., Papago Tribal Utility Authority v. FERC,* 628 F.2d 235, 238–39 (D.C.Cir.), *cert. denied,* 449 U.S. 1061, 101 S.Ct. 784, 66 L.Ed.2d 604 (1980); *Niagara Mohawk Power Corp. v. FPC,* 538 F.2d 966, 969 (2d Cir.1976). *See generally* 16 C. Wright, A Miller, E. Cooper, & E. Gressman, *Federal Practice and Procedure* § 3942 (1977 and supp.1985) (discussion of finality requirement). The final order requirement raises two issues in the context of this case: whether Opinion No. 185–A, the order denying rehearing, *inter alia,* on the claim of undue discrimination, was a final order for purposes of appellate review; and if so, whether we may nonetheless address the discrimination claim pursuant to a timely petition for review of the subsequent order of November 28, 1983.

The Supreme Court has stated that the orders encompassed within § 313(b) "relat[e] to orders of a definitive character dealing with the merits of a proceeding before the Commission and resulting from a hearing upon evidence and supported by findings appropriate to the case." *FPC v. Metropolitan Edison Co.,* 304 U.S. 375, 383–85, 58 S.Ct. 963, 966–67, 82 L.Ed. 1408 (1938). "Ordinarily, an agency order is fi-

---

**11.** The two applications for rehearing filed by the municipalities satisfied this timeliness requirement.

nal for purposes of appellate review when it 'imposes an obligation, denies a right, or fixes some legal relationship as a consummation of the administrative process[.]' " *Papago Tribal Utility Authority*, 628 F.2d at 239 (quoting *Cities Service Gas Co. v. FPC*, 255 F.2d 860, 863 (10th Cir.), *cert. denied*, 358 U.S. 837, 79 S.Ct. 61, 3 L.Ed.2d 73 (1958)). *See also Chicago & Southern Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 112–13, 68 S.Ct. 431, 436–37, 92 L.Ed. 568 (1948); *Conway Corp. v. FPC*, 510 F.2d 1264 (D.C.Cir.), *aff'd* 426 U.S. 271, 96 S.Ct. 1999, 48 L.Ed.2d 626 (1976).

Opinions No. 185 and 185–A meet the above mentioned tests. Taken together, these orders established the rates at which Delmarva was legally entitled to assess its non-setting wholesale customers for electricity supplied to them for the period from December 1, 1978, to November 30, 1980.[12] It cannot be disputed that this action by the Commission "fixed a legal relationship" between Delmarva and the municipalities.[13] It is equally clear that the action of the Commission in reversing the ALJ on the discrimination issue "aggrieved" the municipalities within the meaning of § 313(b). We therefore conclude that, had the municipalities petitioned in this court for review of Opinion 185–A within 60 days of its issuance, we would have had jurisdiction to review the opinion as a final order by the Commission. *See Papago Tribal Utility Authority*, 628 F.2d at 239 (describing an order establishing just and reasonable rates as "[t]he quintessential reviewable order."); *see also Cities of Bethany, et al. v. FERC*, 727 F.2d 1131 (D.C.Cir.1984) (reviewing merits of Commission order establishing just and reasonable rates where

wholesale customers of the utilities complained that the rates were based on an unfairly discriminatory demand allocation methodology).

As we have explained, however, the municipalities did not seek immediate judicial review, but chose instead to apply for further rehearing before the Commission. We must therefore consider the more difficult question whether this Court has jurisdiction to address the discrimination claim raised by the timely petition for review of the subsequent order of November 28, 1983. Section 313(b) provides that a petition for review must be filed within 60 days of "the order of the Commission upon the application for rehearing." The Commission argues that this language requires parties to petition for review of each order in which the Commission completes its rehearing of a particular issue. We do not believe, however, that this bare language of the statute compels the conclusion urged upon us by the Commission. Courts have read a requirement of finality into § 313(b) only after a full consideration of the proper allocation of responsibilities between the expert administrative agencies and the judiciary. The same criteria are relevant in resolving the jurisdictional question in this case.

The doctrine of finality serves interests closely related to those served by the doctrine of exhaustion of administrative remedies. Common to the two doctrines "is a careful balancing of the need for effective judicial protection against the need for efficient and responsible administrative action." *Aquavella v. Richardson*, 437 F.2d 397, 403 (2d Cir.1977) (quoted in 16 C. Wright, A. Miller, E Cooper & E.

---

**12.** The Commission initially decided the issues in Opinion No. 185, and modified its original order in the Opinion on Rehearing. Because of the statutory rehearing requirement in § 313, however, it is more accurate to refer to Opinion No. 185–A as the "final order."

**13.** Indeed, the municipalities make no serious attempt here to analogize the Commission order establishing just and reasonable rates to orders that have been characterized as "interlocutory," and therefore not reviewable, *e.g., Boroughs of Ellwood City, et al. v. FERC*, 701 F.2d 266 (3d

Cir.1983) (order setting length of new electric rate suspension period held to be interlocutory and unreviewable under § 313(b)); *Niagara Mohawk Power Corp. v. FPC*, 538 F.2d 966 (2d Cir.1976) (order of the Commission denying motion of utility to dismiss an investigation was unreviewable where no investigation had as yet commenced). *Cf. United Municipal Distributors Group v. FERC*, 732 F.2d 202, 206 n. 4 (D.C.Cir. 1984) (ripeness doctrine demands an analysis informed by pragmatic concerns) (citing cases).

Gressman, *supra,* § 3942, at 314 n. 6 (1977)). *See generally McKart v. United States,* 395 U.S. 185, 193–95, 89 S.Ct. 1657, 1662–63, 23 L.Ed.2d 194 (1969).[14] When, as in this case, the objection to a court's assuming jurisdiction centers on the tardiness rather than the prematurity of a petition for judicial review, there is little reason to fear that judicial review will inappropriately displace agency expertise or intrude upon agency autonomy. Substantial considerations of judicial and administrative efficiency, on the other hand, are relevant. "[O]ne of the principal reasons to await the termination of agency proceedings is the possibility that a dispute may be mooted if the party ultimately prevails before the agency, thereby obviating all occasion for judicial review." *Bethlehem Steel Corp. v. U.S.E.P.A.,* 669 F.2d 903, 908 (3d Cir.1982) (quoting *FTC v. Standard Oil Co. of California,* 449 U.S. 232, 244, 101 S.Ct. 488, 495, 66 L.Ed.2d 416 (1980)).

The municipalities contend, in this regard, that a favorable determination of the two issues on which the municipalities petitioned for review of Opinion No. 185–A would have benefitted the municipal class by $1,036,000, limiting the disparity for the entire wholesale municipal class to $592,-000, and to substantially less for the petitioners, four members of the twelve-member municipal class. The municipalities therefore argue that, had they prevailed on rehearing, they might have decided against any appeal of this case. At a minimum, their success upon further rehearing before the Commission would likely have narrowed the amount of the alleged discrimination, thereby altering the character of the record and of the case.

Additionally, the municipalities note that successive petitions arising from the same case need not be filed in a single court of appeals, because the Federal Power Act allows aggrieved parties a choice of forums for review.[15] Conceivably, if petitions for review were filed after two Commission orders on rehearing, two different courts of appeals might have under consideration different aspects of an order while the Commission continues to consider still other aspects of the same order—a wasteful, inefficient result.

These considerations must be balanced against the danger that, as Delmarva contends, "the sixty day review period could be frustrated through the *seriatim* filing of rehearing petitions with FERC." Brief of Intervenor at 15, n. 5. We believe, however, that any concern on the part of the Commission over the prospect of dilato-

---

**14.** In *McKart,* the Supreme Court commented on these concerns in the context of a case raising the question of the extent to which a party was required to exhaust his administrative remedies:

A primary purpose is, of course, the avoidance of premature interruption of the administrative process. The agency, like a trial court, is created for the purpose of applying a statute in the first instance. Accordingly, it is normally desirable to let the agency develop the necessary factual background upon which decisions should be based.... And of course it is generally more efficient for the administrative process to go forward without interruption than it is to permit the parties to seek aid from the courts at various intermediate stages.

. . . .

Closely related ... is a notion peculiar to administrative law. The administrative agency is created as a separate entity and invested with certain powers and duties. The courts ordinarily should not interfere with an agency

until it has completed its action, or else has clearly exceeded its jurisdiction.

. . . .

In addition, other justifications for requiring exhaustion in cases of this sort have nothing to do with the dangers of interruption of the administrative process. Certain very practical notions of judicial efficiency come into play as well. A complaining party may be successful in vindicating his rights in the administrative process. If he is required to pursue his administrative remedies, the courts may never have to intervene. And notions of administrative autonomy require that the agency be given a chance to discover and correct its own errors.

395 U.S. at 193–95, 89 S.Ct. at 1662–63.

**15.** Pursuant to § 313(b), a party may obtain review either "in the United States Court of Appeals for any circuit wherein the licensee or public utility to which the order relates is located or has its principal place of business or in the United States Court of Appeals for the District of Columbia."

ry, repetitive petitions for rehearing can readily be remedied by Commission regulation. In any event, there is no intimation in this record that the municipalities' second petition for rehearing was frivolous. One of the matters raised in that petition was the municipalities' contention that the Commission's refusal to require Delmarva to allocate demand costs to the Q rate (interruptible loads) customers stemmed partly from the erroneous finding that Delmarva credited the demand charges included in the Q rate tariff against the full-requirements customers' cost for the use of the system. This basis for the Commission's decision became apparent only upon the issuance of Opinion No. 185–A. In its November 28 order, the Commission decreed that "if Delmarva has not credited these

charges ... it is hereby directed to follow the policy set forth in Opinion No. 185–A, and do so." 25 F.E.R.C. ¶ 61,308 (*reprinted in* Appendix at 103). In essence, the November 28 order was a clarification and modification Opinion No. 185–A which implicitly acknowledged an ambiguity in the earlier opinion.

To the extent that the objections raised in the second petition for rehearing became available only upon issuance of Opinion No. 185–A, § 313(b) would appear not only to permit but to require that these objections be raised before the Commission in the first instance. *See FPC v. Colorado Interstate Gas Co.*, 348 U.S. 492, 498–99, 75 S.Ct. 467, 471, 99 L.Ed. 583 (1955) (court of appeals may not consider, *sua sponte*, objection not first raised before agency).[16]

---

**16.** The rehearing requirement in § 313(b) and the facts of this case distinguish it from those cases relied upon by the Commission. *Provisioners Frozen Exp., Inc. v. ICC*, 536 F.2d 1303 (9th Cir.1976) (per curiam), for example, involved a statute without a rehearing requirement. *See* 28 U.S.C. §§ 2341–2350 (1976 and supp.1984) (providing for review of orders, *inter alia*, of the Interstate Commerce Commission and Federal Maritime Commission). The petitioners in that case sought rehearing as provided for by regulation, however, and the ICC denied reconsideration in an order which thereupon became "administratively final" pursuant to ICC regulations. *Id.* at 1304. The regulations also provided that further petitions upon substantially the same grounds would not be entertained. Despite the regulations the petitioners persisted before the agency, filing two successive further petitions for reconsideration, both of which were denied. The court held that a petition for review from the third denial of reconsideration did not give it jurisdiction to address the substance of the original ICC order. *Id.* at 1305.

The Commission has not cited any FERC regulation, comparable to the one in *Provisioners*, which would have given the municipalities notice that their second rehearing petition would not be entertained. On the contrary, the petition raised an issue which the Commission might well have been obliged to consider under § 313(b). *See Municipal Electric Utilities Association of New York State v. Power Authority of the State of New York*, 23 F.E.R.C. ¶ 61,302 (1983); *supra,* typescript at 21. In these circumstances, we believe that *Provisioners* is distinguishable.

*Louisville Gas & Electric Co. v. FPC*, 129 F.2d 126, 131 (6th Cir.1942), *cert. denied*, 318 U.S. 761, 63 S.Ct. 559, 87 L.Ed. 1133, *reh. denied*, 318

U.S. 800, 63 S.Ct. 768, 87 L.Ed. 1164 (1943), and *Midwestern Gas Transmission Co. v. FERC*, 734 F.2d 828 (D.C.Cir.1984) are inapposite, for neither case dealt with the factual situation involved here: a single Commission order, two successive petitions for rehearing, and a timely petition for review following the second order on rehearing. Both *Louisville Gas & Electric* and *Midwestern Gas Transmission* dealt with situations involving two or more distinct Commission orders. The petitioners in those cases sought to obtain judicial review of the earlier orders by way of petitions for review filed upon the denial of rehearing of the later orders. The petitioner utility in *Louisville Gas & Electric* sought review of three Commission orders, issued in 1933, 1937, and 1939. The utility had argued that the Commission orders issued in 1933 and 1937 were not appealable because they did not aggrieve the petitioner or otherwise meet the test of finality discussed *supra*, typescript at 15–17. The court disagreed, and accordingly dismissed the petition for review, insofar as it sought relief from the two earlier orders. 129 F.2d at 130–31. In *Midwestern Gas Transmission*, the petitioner argued that it was "aggrieved" only upon the issuance of an "unexpected" interpretation of a Commission regulation, and not by its prior acceptance of the regulatory condition in a certificate of public necessity and convenience granted by order of the Commission. The court held that regulation was clear and the Commission's reading of it correct, and concluded that "there was no doubt that Midwestern was aggrieved at the time it accepted the certificate with conditions." 734 F.2d at 832. Thus, because Midwestern failed to seek reconsideration of the condition at the time it accepted the certificate, it was barred from doing so subsequently. Both of these cases are very different from the case at bar.

The Commission's rejoinder is that only the Rate Q and cash working capital issues, not the discrimination issue, possibly required further rehearing, and that the municipalities should have petitioned for review and requested a stay pending the final disposition on the Rate Q question.

We agree with the Second Circuit, which squarely rejected a similar argument in *State of New York v. United States*, 568 F.2d 887 (2d Cir.1977). In that case, the Interstate Commerce Commission had denied reconsideration of an earlier order with respect to three rates but granted reconsideration as to a fourth. The petitioners filed no petition for review until beyond 60 days after the partial denial but within 60 days from the date of a subsequent order declaring all four rates to be lawful. The court held that it had jurisdiction to review all four rates, concluding that: "[a]s a practical matter, it would have been judicially imprudent for us as a reviewing court to consider piecemeal the initial order while the proceeding as a whole remained pending before the Commission." *Id.* at 893. The court specifically rejected the Commission's argument that petition for review of the first order could have been filed in court and the action could have been stayed until the conclusion of the administrative proceedings. *Id.* The court concluded that the Commission's approach ran counter to "the deeply rooted policies of the federal courts against piecemeal appeals and in favor of allowing administrative proceedings to run their

course without interference from the courts." *Id.*[17]

This "laudably practical" approach, 16 C. Wright, *et al.*, *supra*, ¶ 3942, at 185–86 notes 5 and 10, is consistent with those cases holding that the period for seeking review may be tolled by a petition for rehearing, even though not expressly provided for by statute. The Supreme Court has stated that "[u]nless Congress provides otherwise, '[w]here a motion for rehearing is in fact filed there is no final action until the rehearing is denied.'" *American Farm Lines v. Black Full Freight Service*, 397 U.S. 532, 541, 90 S.Ct. 1288, 1293, 25 L.Ed.2d 547 (1970) (quoting *Outland v. CAB*, 284 F.2d 224 (D.C.Cir.1960). *See also, Pennsylvania v. ICC*, 590 F.2d 1187, 1193 (D.C.Cir.1978); *B.J. McAdams, Inc. v. ICC*, 551 F.2d 1112 (8th Cir.1977); *Outland v. CAB*, 284 F.2d 224 (D.C.Cir.1960).[18] *Contra, Selco Supply Co. v. U.S.E.P.A.*, 632 F.2d 863 (10th Cir.1980), *cert. denied*, 450 U.S. 1030, 101 S.Ct. 1740, 68 L.Ed.2d 225 (1981). It is true that in these cases, the reconsideration and subsequent review involved the same issue. Even so, the policies behind the tolling rule—the avoidance of the practice of filing protective petitions and the fostering of judicial economy—seem equally applicable in this case.

This tolling rule has numerous analogies in the ordinary civil litigation context. Fed.R.App.P. 4(a)(4) provides that the 30-day period for taking an appeal will be suspended by the filing of various types of motions in the district court. *See, e.g., Richerson v. Jones*, 572 F.2d 89, 93 (3d

17. As we have noted, *see supra* note 16, unlike § 313(b) the statutory provision governing review of ICC orders contains no rehearing requirement. To the extent that the rehearing requirement in § 313(b) reflects a legislative determination to give FERC an additional opportunity, prior to judicial involvement, to consider difficult technical issues, the policy arguments articulated in *State of New York* are perhaps even more compelling in the Federal Power Act context.

18. In *Outland*, the progenitor of this line of cases, Judge Bazelon noted:
[W]hen the party elects to seek a rehearing there is always a possibility that the order complained of will be modified in a way

which renders judicial review unnecessary. Practical considerations, therefore, dictate that when a petition for rehearing is filed, review may properly be deferred until this has been acted upon. The contrary result … has caused parties to file so called "protective" petitions for judicial review while petitions for rehearing before the Board were pending. A whole train of unnecessary consequences flowed from this: the Board and other parties may be called upon to respond and oppose the motion for review; when the Board acts, the petition for judicial review must be amended to bring the petition up to date. 284 F.2d at 227–28.

Cir.1978) (motion for reconsideration tolls time limitation for appeal). A motion to alter or amend a judgment pursuant to Fed.R.Civ.P. 59, for example, may deal only with one aspect of the district court's judgment, but will nevertheless suspend the appeal period as to the entire judgment. Similarly, the time period will be tolled as to all parties, including those who choose not to file motions in the district court. Fed.R.App.P. 4(a)(4). The judicial economy promoted by this rule is no less desirable in the administrative law context. Additionally, by staying our hand until the disposition of a second petition for rehearing, we give the agency an opportunity to correct any errors in the initial opinion on rehearing. This consideration becomes especially significant in contexts, such as the one in this case, that require the application of much specialized knowledge on the part of the agency.

In sum, we hold that the 60-day period under § 313(b) is tolled while the Commission considers a timely petition for rehearing of an issue addressed in an earlier order on rehearing, and that a timely petition from the second order on rehearing will allow a party to raise all issues that could have been raised in a timely petition for review of the first order. That is the case here.[19] Accordingly, we turn to address the merits of the municipalities' petition.

### III. *THE MERITS*

#### A. *Standard of Review*

■ This Court's review of the Commission's rate-setting function is limited. *North Penn Gas Co. v. FERC,* 707 F.2d 763, 766 (3d Cir.1983).[20] The Federal Power Act provides that "[t]he finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive." 16 U.S.C. § 825*l*(b). *Cf. North Penn Gas,* 707 F.2d at 766 (citing identical provision in Natural Gas Act). As to non-factual matters, "[a] presumption of validity ... attaches to each exercise of the Commission's expertise." *Id.* The court is restricted to determining "whether a rational basis exists for a conclusion, whether there has been an abuse of discretion, or ... whether the Commission's order is arbitrary or capricious or not in accordance with the purpose of the Act." *Id.* (quoting *Ohio Power Co. v. FERC,* 668 F.2d 880, 886 (6th Cir.

**19.** In light of our disposition of the jurisdictional issue, we need not address the municipalities' argument that the issues raised in the second rehearing petition are "intertwined" with the discrimination claim, even though that argument, on a stronger record, might have been dispositive.

The municipalities rely on a passage from *Cities of Batavia v. FERC,* 672 F.2d 64, 68, 72 n. 15 (D.C.Cir.1982) (dictum):

While a *petition from an agency order* cannot be filed after the statutory period for filing has run, it may be that *some of the issues* that might have been raised in that appeal are so inextricably linked to a subsequent agency opinion on another aspect of the same case, that those issues may be raised in a timely appeal from the second opinion. For example, the demand allocation issue in this case is an important element not only of Opinion No. 63–A, but also of the agency's price squeeze decision. Therefore, even if Cities' *appeal from Opinion No. 63–A* were not timely filed, Cities might still have been able to raise the *demand allocation issue* in their timely appeal from the agency's final action on the price squeeze issue.

*See also Kansas Cities v. FERC,* 723 F.2d 82, 85–86 (D.C.Cir.1983). The municipalities argue that the rate Q and cash working capital issues are "definitely linked" to the discrimination issue because a favorable resolution of those issues would have narrowed the allegedly undue discrimination. In addition, the rate Q issue itself was originally discussed by the Commission as part of its disposition of the demand allocation issue. We need not decide whether these linkages are so "inextricable" as to support jurisdiction absent our tolling rule. Inasmuch as the municipalities have chosen not to raise the Rate Q and cash working capital issues on the merits, we will assume, without deciding, that these issues are not sufficiently bound up with the discrimination claim to satisfy the *Cities of Batavia* test.

**20.** The relevant statute in *North Penn Gas* was § 19(b) of the Natural Gas Act, 15 U.S.C. § 717r(b). The same standard of review applies in cases arising under the Federal Power Act. *Ohio Power Co. v. FERC,* 668 F.2d 880, 886 (6th Cir.1982), cited in *North Penn Gas,* 707 F.2d at 766; *see Arkansas Louisiana Gas Co. v. Hall,* 453 U.S. 571, 577 n. 1, 101 S.Ct. 2925, 2930 n. 1, 69 L.Ed.2d 856 (1981).

1982) (citations omitted)). *See* 5 U.S.C. § 706 (1977) (Administrative Procedure Act). A reviewing court may not supplant the Commission's balance of competing interests with one more nearly to its liking, but properly may "assure itself that the Commission has given reasoned consideration to each of the pertinent factors." *Gulf Oil Corp. v. FERC*, 575 F.2d 67, 70 (3d Cir.1978) (quoting *In Re Permian Basin Area Rate Cases*, 390 U.S. 747, 791–92, 88 S.Ct. 1344, 1372–73, 20 L.Ed.2d 312 (1968)). *See also North Penn Gas*, 707 F.2d at 766.

### B. *The Undue Discrimination Claim*

■ Under § 205(b) of the Federal Power Act, 16 U.S.C. § 824d(b), public utilities are prohibited from granting any customer any undue preference or advantage or from maintaining an unreasonable difference in rates.[21] It is well settled, however, that differences in rates are justified where they are predicated upon factual differences between customers and that these differences may arise from differing costs of service or otherwise. Under certain circumstances, the fact that some customers have settled with the utility, while others have chosen to litigate, may constitute such a "factual difference." *See, e.g., Cities of Bethany v. FERC*, 727 F.2d 1131, 1139 (D.C.Cir.1984); *City of Frankfort v. FERC*, 678 F.2d 699, 706 (7th Cir.1982); *Boroughs of Chambersburg v. FERC*, 580 F.2d 573, 577 (D.C.Cir.1978); *St. Michaels Utilities Commission v. FPC*, 377 F.2d 912, 916 (4th Cir.1967).

The Commission submits that settlements between customers and utilities are "imperative as a practical matter" in proceedings before it. *See Texas Eastern Transmission Corp. v. FPC*, 306 F.2d 345, 347 n. 2 (5th Cir.1962), *cert. denied*, 375 U.S. 941, 84 S.Ct. 347, 11 L.Ed.2d 273 (1963). In addition to this very substantial

practical consideration, there are other strong policy arguments favoring settlement agreements. In *United Gas Pipe Line Co. v. Mobile Gas Service Corp.*, 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956) ("Mobile"), and *FPC v. Sierra Pacific Power Co.*, 350 U.S. 348, 76 S.Ct. 368, 100 L.Ed. 388 (1956) ("Sierra"), the Supreme Court elaborated upon the importance of fixed rate contracts in the course of holding that under parallel provisions of the Federal Power Act and the Natural Gas Act, regulated suppliers of gas and electricity may not unilaterally increase the rates charged to customers whose contracts specified fixed rates. The Court noted that fixed rate contracts foster orderly planning and stable power supply arrangements. *Mobile*, 350 U.S. at 344, 76 S.Ct. at 380. Reduced litigation expenses to the parties and more rapid resolution of rate issues, the obverse of the easing of the Commission's burden, are other benefits. For these reasons, the Supreme Court in *Mobile-Sierra* "ma[d]e it crystal clear that a heavy burden must be met before a customer who has negotiated a fixed-price contract can be deprived against his will of the benefits of his bargain." *Town of Norwood*, 537 F.2d at 1310. The policies underlying the *Mobile-Sierra* doctrine apply with equal force to settlement agreements. *Cities of Bethany*, 727 F.2d at 1139.

A tension between the anti-discrimination mandate of § 205(b) and the essentially pro-settlement bias of the *Mobile-Sierra* doctrine arises whenever settling customers pay less, as a result of their fixed price arrangement with the utility, than similarly situated non-settling customers. The municipalities' proposed remedy, and the one adopted by the ALJ, was for the Commission to eliminate the discrimination insofar as is compatible with the Commission's duty to establish "just and reasonable" rates, *see* § 205(a) of the Federal Power

---

**21.** The full text of the provision reads:

(b) No public utility shall, with respect to any transmission or sale subject to the jurisdiction of the Commission, (1) make or grant any undue preference or advantage to any person or subject any person to any undue prejudice

or disadvantage, or (2) maintain any unreasonable difference in rates, charges, service, facilities, or in any other respect, either as between localities or as between classes of service.

16 U.S.C. § 824d(b).

Act, 16 U.S.C. § 824d(a), by lowering Delmarva's rate of return from the municipalities to the "lower end of the zone of reasonableness." *See FPC v. Conway Corp.*, 426 U.S. 271, 96 S.Ct. 1999, 48 L.Ed.2d 626 (1976); 17 FERC ¶ 63,044 at 88 (1981) (initial decision by the ALJ). Delmarva resists this proposal vigorously, for it would reduce the utility's rate of return despite the Commission's finding, not disputed by the municipalities, that Delmarva "did not advantage itself by settling." 24 FERC ¶ 61,199, at 61,466 (1983). In its opinion, the Commission expressed a reluctance to further "increase the inadequacy of Delmarva's rates." *Id.* The Commission also contends that affording the municipalities relief under the facts of this case would discourage individual customers from settling.

Delmarva and the Commission urge that we respect the integrity of the settlement agreement and tolerate the rate disparity resulting therefrom.[22] In adopting this position, the Commission relies principally on its decision in *Central Illinois Public Service Company* ("*CIPSCO* "), 20 F.E.R.C. ¶ 61,043 (1982) (Opinion No. 142), *applications for rehearing denied*, 20 F.E.R.C. (CCH) ¶ 61,435 (1982), *affirmed as modified, Cities of Bethany v. FERC*, 727 F.2d at 1139; *United Municipal Distributors Group v. FERC*, 732 F.2d 202, 212 (D.C. Cir. April 13, 1984); *see also City of Frankfort*, 678 F.2d at 706–07; *Town of Norwood v. FERC*, 587 F.2d 1306, 1312–13 (D.C.Cir.1978).

In *Cities of Bethany*, the Commission confronted a factually similar situation. *But cf. infra*, typescript at 37 & note 27 (noting distinctions between *CIPSCO* and the present case). The Commission evaluated the present settlement agreements essentially according to the same standard employed in *CIPSCO* and affirmed by the court in *Cities of Bethany:*

[W]here a temporary difference in rates or between classes of customers has a

logical explanation and where that difference is not due to bad faith or improper conduct on the part of the utility, then the difference should not be held unlawful in the absence of evidence, information or facts which would either demonstrate or permit the Commission to find that the disparity in rates is likely to result in actual competitive harm or would otherwise be unduly discriminatory.

24 FERC ¶ 61,199 at 61,465–466. The Commission found all the elements of the *Cities of Bethany* test met here, and concluded on that basis that there was no undue discrimination in violation of § 205(b).

■ The tension between the anti-discrimination mandate of § 205(b) and the pro-settlement bias of the *Mobile-Sierra* doctrine is not easily resolved in this case. We are troubled by the fact that the municipalities are paying a somewhat higher rate to Delmarva than the cooperatives for a reason not related to cost of service as determined under the 12–CP method of demand allocation adopted by the Commission in this case. There is thus a discrimination. But the question before us is whether there has been an *undue* discrimination, which is what § 205(b) proscribes. We think that the factors utilized by the Commission in this proceeding (and approved by the court in *Cities of Bethany* ) appropriately inform our judgment on the question whether the discrimination was "undue," not only because the notion of undue discrimination itself gives rise to flexibility in interpretation by the Commission, but also because of our perception of the *Cities of Bethany* test as one that is sharply circumscribed, limited in time, not harsh in application, and that serves important public interests. While the test may have no broader compass than is necessary to accommodate the facts of this case, for the reasons that follow, we find it dispositive here and hold that the Commission's decision to tolerate

---

**22.** A third possibility, of course, would be to eliminate the discrimination by *raising* the fixed contract rate. *Town of Norwood*, 587 F.2d at 1311. This course would deprive the coopera-

tives of the benefits of their bargain and would also diminish the attractiveness of settlements generally. At all events, none of the parties advocates it here.

the discrimination is not arbitrary and capricious.

The municipalities challenge both the content and the application of the *Cities of Bethany* test. Before reaching the matter of the application of the standard, we consider the municipalities' objection to the requirement that, absent evidence of bad faith or improper conduct, they must show actual competitive harm as a prerequisite to obtaining relief. *Cities of Bethany,* 727 F.2d at 1139. *See also United Municipal Distributors Group v. FERC,* 732 F.2d 202, 212 (D.C.Cir.1984). The municipalities submit that *Cities of Bethany* is distinguishable from the present case, and that in any event the District of Columbia Circuit in that case did not properly interpret the requirement of § 205(b).

The municipalities contend that a showing of potential competitive harm should suffice to establish "undue" discrimination, and that they have made such a showing. They point out that Delaware is a small state, and that the municipalities are in proximity to the cooperatives. An industry or commercial establishment seeking to locate in Delaware may choose locations in various parts of the state, influenced in substantial part by the cost of electricity.[23] In their submission, the municipal systems are at a competitive disadvantage so long as their rates are discriminatorily higher than cooperative rates, even if only for a discrete, locked-in period. However, the municipalities have adduced no evidence of actual competitive harm, properly defined by the Commission as "failing to attract customers or losing existing customers to the cooperatives."

The court in *Cities of Bethany* addressed and squarely rejected the potential harm standard. As that court pointed out, the

application of this standard is reserved to a particular class of situations, designated as "price squeezes," in which there is competition between a utility and its customers in a common market. The court stated:

> The Cities' reliance on FERC's presumption of anti-competitive effects in a price squeeze context is misplaced. The price squeeze cases, in which anti-competitive effects are presumed to result from price discrimination, originally arose under the antitrust laws. The anti-competitive danger in price squeeze situations is that a dominant utility supplier which competes with a wholesale customer in retail market will charge such high rates to the wholesale customer that the customer can no longer compete with the utility in the retail market.... Any anti-competitive danger from the rate disparity here is considerably more attenuated than is the harm in a price squeeze situation.

727 F.2d at 1140–41 (footnote omitted). In the instant case, as in *Cities of Bethany,* there is no allegation that the company is attempting to gain a competitive advantage in a retail market in which both the municipalities and Delmarva compete. Thus, the court's reasoning in *Cities of Bethany* should apply equally here. The price squeeze is a specifically defined kind of situation which is not present in this record.[24]

The short of it is that we do not consider the Commission's requirement that there be proof of actual harm to be unreasonable. The Commission contends that a potential competitive harm standard which, we note, may well be procrustean in its stretch, would seriously undermine the incentives for settlement. We are not prepared to substitute our judgment for the

---

**23.** There is evidence in the record, for instance, that Delaware Electric cooperative provides service near Milford, Delaware, that Milford compares its rates with those of Delaware Electric cooperative and that the Delaware Electric cooperative is also located in proximity to Smyrna, Delaware and can serve certain borderline customers.

**24.** The municipalities' original objections to Delmarva's 1978 filing included allegations of price squeeze, but these claims have apparently been settled, with the exception of the claims of the Town of Seaford. *See* 24 F.E.R.C. ¶ 61,199, at 61,469 (*reprinted in* Joint Appendix at 92–93). The municipalities do not rely on the presence of this remaining claim as a basis for distinguishing *Cities of Bethany.*

Commission's in this respect. Accord *Cities of Bethany*, 727 F.2d at 1139.[25]

We turn to the municipalities' objections to the application of the Commission's standard. They raise two principal arguments. First, the municipalities argue that it was unreasonable for Delmarva to file a rate increase and to settle on the basis of a 4–DCP method of demand allocation, asserting that such a method had never been accepted by the Commission in a litigated case, that it was contrary to Commission precedent, and that the record shows that Delmarva had undertaken no study to determine its reasonableness. Joint Appendix at 188–89. These facts, according to the municipalities, "should have demonstrated to a reasonable utility that a successful claim of discrimination would be made if [Commission] precedent held." Brief of Petitioner at 14. In terms of the standard applied by the Commission, the tenor of this argument is that the discrimination is due to improper conduct on Delmarva's part in the original filing and settlement.

We find the municipalities' objections to the application of the *Cities of Bethany* standard to be without merit, and indeed are satisfied that the Commission's opposite conclusion is supported by substantial evidence. In particular, it is clear that when Delmarva filed the rate increase on May 31, 1978, and entered into the settlement agreement with the cooperatives on September 11, 1978, there was no firmly defined Commission policy on demand allocation, as the ALJ acknowledged. 17 F.E. R.C. ¶ 63,044, at 47. *See Idaho Power Co.*, 3 FERC ¶ 61,108 at 61,301 n. 44 (1978) (choice of appropriate demand allocation methodology depends upon facts and circumstances relating to particular utilities). An extensive evidentiary hearing was necessary to develop the facts supporting the ALJ's and Commission's determination that the 12–CP method was appropriate for Delmarva. The initial decision was issued over

three years after the filing, and after FERC approval of the settlement agreement.

In fact, a number of the Commission precedents relied upon by the ALJ and the Commission in finding the 12–CP method to be appropriate were issued *after* the consummation of the settlement agreement. *E.g., Louisiana Power & Light Co.*, Opinion No. 110, issued Jan. 28, 1981; *Lockhart Power Co.*, Opinion No. 29, issued Sept. 22, 1978, *Illinois Power Co.* Docket No. ER77–531, issued Apr. 10, 1981. *See also Carolina Power and Light Co.*, Opinion No. 19, issued Aug. 2, 1978 (issued after Delmarva's rate filing but prior to settlement agreement).

Additionally, the record indicates that the 4–DCP method had been accepted by the three state regulatory commissions (those of Delaware, Maryland and Virginia) charged with regulating Delmarva's retail sales of electricity. The municipalities correctly point out that such determinations are not controlling on the Commission. *See Alabama Power Co.*, Opinion No. 54, issued August 1, 1979. However, the Commission relied on the state law proceedings only insofar as they are evidence that Delmarva's advocacy of the 4–DCP was not illogical.

The Commission also relied on the fact that Delmarva offered the municipalities the same discount from its filed rates as it offered to the cooperatives. This is not a case, therefore, where a utility enters into a "sweetheart" deal based on terms not extended equally to all its customers. *See United Municipal Distribution Group v. FERC*, 732 F.2d 202, 212–13 (D.C.Cir.1984) (settlement not based on bad faith or improper conduct where offer was extended to all customers). Apart from the fact that the 4–DCP method was later found to be inappropriate, the municipalities cite no evidence of bad faith or improper conduct.

**25.** While we need not rely on it as a basis for decision, we also note that the municipalities' utility operations are profitable. The record indicates that the municipalities are earning 34.6 to 58.9 percent on their rate base from their own sales of electricity at retail. (Joint Appendix at 331, 343).

We conclude that substantial evidence supports the Commission's finding that Delmarva's advocacy of the 4–DCP method was not illogical or improper. To be sure, the Commission ultimately rejected the 4–DCP method. But Delmarva is in fact a summer-peaking company, *see supra* typescript at 6 and note 5, and (a) in the absence of a prior Commission determination relating to Delmarva's system; and (b) in the presence of conflicting state commission determinations, we cannot say that the Commission acted unreasonably in refusing to characterize Delmarva's advocacy of the 4–DCP method as beyond the pale.

The municipalities attempt to distinguish *Cities of Bethany* by noting that the differential between the cooperative and municipal rates in the instant case is substantially larger than the differential in the *Cities of Bethany* case. While the differential is somewhat larger in this case,[26] we do not view this factor as decisive. More significantly, we do not think it amounts to an "undue burden" justifying a remedy.

Additionally, we note that there is no evidence that Delmarva was overreaching and benefitting itself in settling, and the Commission so found. 21 F.E.R.C. ¶ 61,199, at 61,466 (*reprinted in* Joint Appendix at 89). The Commission ultimately established rates which allowed Delmarva a 13.3 percent return on equity. The Commission's rate decision was issued at a time when other utilities were receiving up to 17 percent on equity. *See, e.g.,* Connecticut Yankee Atomic Power Co., Opinion No. 148, 20 FERC ¶ 61,373 (1982) (17 percent return on equity); Arizona Public Serv. Co., Opinion No. 177–A, 25 FERC ¶ 61,166 at 61,459 (1983) (16.86 percent return on equity); New England Power Company, Opinion No. 158, 22 FERC ¶ 61,123 (1983) (16.14

percent return on equity). Moreover, by settling with only the cooperatives, Delmarva exposed itself to the risk that the Commission subsequently would settle on an allocation methodology that allocated to the cooperatives substantial demand costs not accounted for in the settlement agreement, thereby lowering the demand costs allocable to the municipalities and the revenues obtainable from them. Indeed, this is precisely what occurred.

We are well aware, of course, that a utility may not "use a fixed-rate contract as a device to render unassailable an otherwise prohibited undue preference." *Town of Norwood,* 587 F.2d at 1313. On the other hand, the determination whether there is an "undue burden" requires a decisionmaker to weigh the effects of a particular decision against the impact it will have on future settlements. Given these considerations, it seems appropriate for us to accord a certain amount of deference to the Commission's judgment in this regard.[27] Additionally, the discriminatory effects of the settlement in this case are readily quantifiable and are limited to a two-year period. In its more recent filings, Delmarva has employed the 12–CP method. Thus it appears unlikely that the issue in this case will recur.

We conclude that the Commission acted reasonably in applying the *Cities of Bethany* standard to this case. The standard strikes an appropriate balance between the Federal Power Act's proscription of undue discrimination and the strong policies favoring settlements of rate cases. We also conclude that the Commission applied the standard correctly, and that its findings of fact are supported by substantial evidence. *A fortiori,* the Commission's action was in

---

26. Under the Commission's order, Delmarva's rate of return on its sales to the municipalities is 1.89 percent greater than the rate of return on sales to the cooperatives under the settlement. The analogous difference in the *Cities of Bethany* was 1.08 percent (Joint Appendix at 88, n. 73). *But cf. supra,* note 26 (noting high returns to municipalities on their retail sales of electricity).

27. The municipalities also point out that the settlement in the *Cities of Bethany* case was based on the 3–CP method, which, unlike Delmarva's 4–DCP method, had been previously accepted by the Commission. To the extent this distinction is relevant, it bears on the question whether Delmarva acted in bad faith or illogically in advocating the 4–DCP method. *See supra,* typescript at 35.

conformity with the statute and was not arbitrary and capricious. The petition for review will be denied.